AFFIRM; Opinion Filed December 10, 2012.



In The

# Court of Appeals

# Fifth District of Texas at Dallas

No. 05-11-00786-CV

RTKL ASSOCIATES, INC., Appellant

V.

TRANSCONTINENTAL REALTY INVESTORS, INC., Appellee

On Appeal from the 134th District Court
Dallas County, Texas
Trial Court Cause No. 09-10076-G

# OPINION

Before Justices Moseley, Fillmore, and Myers
Opinion By Justice Myers

RTKL Associates, Inc. appeals the summary judgment in favor of Transcontinental Realty

Investors, Inc. (TCI) on RTKL's claim for breach of contract. RTKL brings one issue contending

the trial court erred in granting TCI's motion for summary judgment. We affirm the trial court's

judgment.

## BACKGROUND

This lawsuit arises out of the settlement of prior litigation. RTKL provided architectural

services to Woodmont Investment Co., L.P. for a real estate development. The property being

developed was owned by Woodmont TCI Group XIII, L.P. (XIII), and TCI was the one hundred

percent shareholder of XIII's majority-interest limited partner.[1]

Woodmont Investment Co., L.P. sued RTKL seeking a declaration that its architectural-services agreement with RTKL was invalid and that RTKL was not entitled to recover unpaid fees. RTKL filed a counterclaim against Woodmont Investment Co., L.P and its general and limited partners, Woodmont Investment Co. GP LLC and Daniel Robinowitz.[2]

On March 12, 2009, the parties engaged in mediation and reached a tentative settlement (the mediation document). They agreed that RTKL would be paid $700,000, with $140,000 down and $560,000 in monthly payments of $10,000. They agreed that the payments would be made by "TCI." The mediation document required that TCI approve the agreement by 5:00 p.m. on March 16. At 5:53 p.m. on March 16, Tonya Parker, an attorney for Woodmont Investment Co., L.P., its general partner, and Robinowitz, sent an e-mail to RTKL's attorney, Hollye Fisk, stating, "I just received word that TCI has approved the settlement. I will move forward with preparation of settlement documents." Parker sent Fisk draft settlement documents on April 13, 14, 23, and 27 showing TCI as the paying party.

Sometime between April 27 and April 30, Parker told Fisk that the payor on the settlement would be XIII.[3] By May 7, all the parties signed the formal settlement agreement with XIII as the payor. On June 30, XIII filed for bankruptcy protection. RTKL then learned that XIII had no cash or bank accounts but had hundreds of thousands of dollars of trade debt as well as the $700,000

---

[1] XIII owned the property. XIII's general partner was LC Station GP, LLC, which owned a 0.1 percent interest in XIII. The Class A limited partner was T LC Station, Inc., which held a 75 percent interest in XIII. TCI owned 75 percent of T LC Station, Inc. Daniel Moos was TCI's president and chief executive officer. Woodmont Investment Co., L.P. was XIII's Class B limited partner, holding a 24.9 percent interest in XIII.

[2] To clarify, Woodmont Investment Co., L.P. was a limited partnership. Its general partner was Woodmont Investment Co. GP, LLC. Daniel Robinowitz was president of Woodmont Investment Co. GP, LLC and a limited partner of Woodmont Investment Co., L.P.

[3] Fisk testified that Parker told him that XIII had assets to fund the settlement. Parker denied making any statements to Fisk concerning XIII's ability to fund the settlement.

settlement debt.

RTKL sued TCI and Robinowitz for breach of contract and fraud seeking actual damages of $700,000. TCI moved for summary judgment on RTKL's claims against it, which the trial court granted. RTKL's fraud claims against Robinowitz proceeded to trial, and the jury found that Robinowitz did not commit fraud. The trial court entered judgment that RTKL take nothing on its claims against TCI and Robinowitz. RTKL now appeals the summary judgment on its claim for breach of contract against TCI.

## STANDARD OF REVIEW

TCI moved for summary judgment on both no-evidence and traditional grounds. The standard for reviewing a traditional summary judgment is well established. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985); *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 825 (Tex. App.—Dallas 2010, no pet.). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon*, 690 S.W.2d at 549; *In re Estate of Berry*, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp.*, 12 S.W.3d 172, 175 (Tex. App.–Dallas 2000, pet. denied).

## RELEASE

TCI's grounds for summary judgment included that it was released by RTKL from any liability under the formal settlement agreement. Paragraph 4 of the agreement provided:

The RTKL Parties hereby completely and irrevocably release and forever discharge the Woodmont Parties (including its present, future, or former, direct or indirect parents, subsidiaries, affiliates, agents, legal representatives, employees, officers, directors, partners, shareholders, insurers and attorneys) from any and all past, present or future causes of action, claims, damages or losses, of whatever kind or nature, in law or equity, relating to or arising in any manner from (a) the claims, defenses, and allegations made in Litigation No. 1 and Litigation No. 2 described in Paragraph 2 above, including claims that were included or could have been included in Litigation No. 1 and Litigation No. 2; and (b) any other facts known to the RTKL Parties up to the date of its [sic] execution of this settlement agreement.

The settlement agreement also provided it would "inure to the benefit of the respective present, future or former, direct or indirect parents . . . of the undersigned," which included XIII. TCI was not a party to Litigation Nos. 1 and 2, so the only way it could be released was under provision (b), "any other facts known to the RTKL Parties up to the date of its execution of this settlement agreement." TCI would then be released if it was one of the "Woodmont Parties" or one of their direct or indirect parents, subsidiaries, affiliates, agents, etc.

The Woodmont Parties were specifically listed in the agreement, and they did not include TCI. However, XIII was one of the Woodmont Parties. TCI asserted in its motion for summary judgment that it was released by the agreement and was a beneficiary of the agreement because it was a direct or indirect parent of XIII. TCI stated in the motion that it owned T LC Station, Inc., which was a seventy-five percent owner and Class A limited partner of XIII. In its reply to RTKL's response to the motion for summary judgment, TCI cited to the statutory definition of "parent," section 1.002(65) of the Texas Business Organizations Code.

The Texas Business Organizations Code defines "Parent" as meaning:

an organization that directly or indirectly through or with one or more of its subsidiaries:

(A) owns at least 50 percent of the outstanding ownership or membership interests of another organization; or

-4-

(B) possesses at least 50 percent of the voting power of the owners or members of another organization.

TEX. BUS. ORGS. CODE ANN. § 1.002(65) (West 2012). The code defines "ownership interest" as meaning:

> an owner's interest in an entity. The term includes the owner's share of profits and losses or similar items and the right to receive distributions. The term does not include an owner's right to participate in management.

*Id.* 1.002(64). The code defines subsidiary as meaning:

> an organization for which another organization, either directly or indirectly through or with one or more of its other subsidiaries:
>
>> (A) owns at least 50 percent of the outstanding ownership or membership interest of the organization; or
>>
>> (B) possesses at least 50 percent of the voting power of the owners or members of the organization.

*Id.* § 1.002(85).

T LC Station, Inc. owns seventy-five percent of the interest in XIII; thus, T LC Station, Inc. is the parent of XIII. *See id.* § 1.002(65). TCI owns one hundred percent of the shares of T LC Station, Inc., so T LC Station, Inc. is the subsidiary of TCI. Therefore, TCI is a parent of XIII because it indirectly through its subsidiary T LC Station, Inc. "owns at least 50 percent of the outstanding ownership or membership interests of" XIII.

RTKL argues that the statutory definition of "parent" is not applicable because the settlement agreement provided for the release of the "direct or indirect parent," and TCI cited only the definition of "parent," not "direct or indirect parent." We disagree. The definition of "parent" provides meanings for both direct and indirect parentage. Under the definition, an entity is a direct parent if the entity itself owns fifty percent of another organization. The entity is an indirect parent if it owns through a subsidiary fifty percent or more of another organization. *See* BUS. ORGS. § 1.002(65).

—5—

Thus, T LC Station, Inc. is a direct parent of XIII, and TCI, through its subsidiary T LC Station, Inc., is an indirect parent of XIII.

RTKL asserts TCI waived the argument that it was a direct or indirect parent of XIII under the definitions in the Business Organizations Code because it did not cite to the statute in its motion for summary judgment. The first time TCI cited the statute was in its reply to RTKL's response to the motion for summary judgment. The grounds supporting the grant of summary judgment must be contained in the motion for summary judgment and may not be presented for the first time in a reply to a response to the motion for summary judgment. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993); *Sanders v. Capitol Area Council*, 930 S.W.2d 905, 910 (Tex. App.—Austin 1996, no writ). TCI's ground in its motion for summary judgment was headed, "Plaintiff Released TCI as Part of the Settlement Agreement." Under that heading, TCI stated it was not one of the listed parties in the settlement agreement. It then quoted the release language set out above that released the parties and their direct and indirect parents. It then stated that it was a beneficiary of the settlement agreement because it was a direct or indirect parent of XIII, and it quoted the paragraph of the agreement stating the agreement inured to the benefit of the parties' direct and indirect parents. TCI then stated it was

> "the owner of TLC [sic] Station, Inc., which is a seventy-five percent (75%) owner and Class A limited partner of Woodmont TCI XIII. As such TCI was released by Plaintiff under Paragraph 4 wherein Plaintiff released the "Woodmont Parties" from "any and all past, present or future causes of action, claims, damages or losses, of whatever kind or nature . . . ."

(Footnote omitted.) This language describes TCI's status as an indirect parent and asserts TCI should be released under paragraph 4. TCI's presentation of the ground sufficiently notified RTKL of the issue: that TCI was released under paragraph 4 of the settlement agreement through its status as an indirect parent of XIII, a party to the agreement. TCI's citation to the statutory definition of

–6–

"parent" in its reply to RTKL's response to the motion for summary judgment did not present a new ground for summary judgment; it provided authority for the ground set out in the motion for summary judgment. We conclude TCI did not waive this ground for summary judgment.

TCI also argues that paragraph 4 did not release RTKL's claims against TCI because the release did not mention RTKL's breach of contract claim. To release a claim effectively, the releasing instrument must "mention" the claim to be released. *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991). Claims not "clearly within the subject matter" of the release are not discharged, even if those claims exist when the release is executed. *Id.* For the release to "mention" a claim, it does not have to describe specifically a particular cause of action. *See Mem. Med. Ctr. of E. Tex. v. Keszler*, 943 S.W.2d 433, 434 (Tex. 1997) (per curiam). The "mention" requirement does not bar general, categorical releases, but they are narrowly construed. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 422 (Tex. 1984); *see Keszler*, 943 S.W.2d at 434.

In this case, the settlement agreement promised release of the parties and their direct and indirect parents from all claims "relating to or arising in any manner from" (a) Litigation No. 1 and Litigation No. 2, and (b) "any other facts known to the RTKL Parties up to the date of its execution of this settlement agreement."

RTKL argues the settlement agreement did not release TCI from RTKL's breach of contract claim because the agreement did not mention releasing TCI for its obligation under the mediation document to pay RTKL $700,000. RTKL cites *Victoria Bank & Trust Co. v. Brady* in support of its argument. In 1984, Marlyn Brady and the Cattle Co. executed a promissory note to Victoria Bank secured by Brady's ranch. *Brady*, 811 S.W.2d at 933. The Cattle Co. also received a separate line of credit from the bank, secured by a certificate of deposit and a lien on the Cattle Co.'s cattle. *Id.* at 933–34. The Cattle Co. paid off the debt under the line of credit, and the bank released the

–7–

certificate of deposit but did not release the lien on the cattle. *Id.* at 934. Later, the Cattle Co. sold some cattle and received a draft drawn on the bank. *Id.* The bank refused to pay the draft until the Cattle Co. agreed to deduct $40,000 from the draft and to apply it to the debt under the Brady–Cattle Co. note. *Id.* The bank asserted the cattle sold were subject to its lien on the cattle securing the Cattle Co.'s line of credit. *Id.* Brady and the Cattle Co. sued the bank on a variety of claims concerning the note and the sale of cattle. The parties reached a settlement agreement. The agreement described the execution of the Brady–Cattle Co. note and its renewals and extensions and then stated that the Cattle Co. released the Bank from all claims Cattle Co. might have "attributable to the above described loan transaction." *Id.* at 937 & n.8. The supreme court determined the claims concerning the bank's deduction of $40,000 from the proceeds of the sale of cattle based on the bank's lien on the cattle securing the line of credit were not released because they were not mentioned in the release or attributable to the Brady–Cattle Co. note and, thus, were not clearly within the subject matter of the release. *Id.* at 939. *Brady* is not applicable to this case because *Brady* did not involve the general release present in this case.

The case before us is more analogous to *Memorial Medical Center of East Texas v. Keszler*, 943 S.W.2d 433 (Tex. 1997) (per curiam). In that case, Memorial brought a "corrective action" against Keszler and revoked his privileges after he was found guilty of tampering with government records. *Id.* at 434. Keszler sued Memorial. The parties reached a settlement in which Keszler agreed to release Memorial from all claims

> arising out of corrective action taken by [Memorial] against [Keszler] *and any other matter relating to [Keszler's] relationship with [Memorial],* including but not limited to his relationship as a member of the staff or as a physician having clinical privileges, *it being the intent of [Keszler] to release all claims of any kind or character which he might have against [Memorial]* . . . .

*Id.* After the settlement, Keszler sued Memorial for damages for injuries he suffered as a result of

-8-

exposure to a toxic sterilizing agent Memorial used during his employment. *Id.* The supreme court stated the release must "mention" the claim, but it disagreed with the court of appeals' holding that the claim must be specifically enumerated to be released. *Id.* at 435. The supreme court concluded the claim was "mentioned" in the release because Keszler agreed to release all claims relating to his relationship with Memorial, and his claim for toxic exposure during his employment at Memorial was related to his relationship with Memorial. *Id.*

In this case, RTKL agreed to release TCI (as a parent of the named party XIII) from "all . . . claims . . . relating to or arising in any manner from . . . (b) any other facts known to the RTKL Parties up to the date of its execution of this settlement agreement." It is undisputed that RTKL knew when it executed the settlement agreement that TCI had promised in the mediation document to pay RTKL the $700,000 settlement amount. Thus, RTKL's breach of contract claim is "mentioned" in paragraph (b) of the release.[4]

We conclude the trial court did not err in granting TCI's motion for summary judgment on RTKL's breach of contract claim. We overrule RTKL's sole issue.

## CONCLUSION

We affirm the trial court's judgment.

_____
LANA MYERS
JUSTICE

110786F.P05

---

[4] We do not consider whether the claim falls within paragraph (a) of the release for claims relating to or arising out of Litigation Nos. 1 and 2.



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

RTKL ASSOCIATES, INC., Appellant

No. 05-11-00786-CV          V.

TRANSCONTINENTAL     REALTY
INVESTORS, INC., Appellee

Appeal from the 134th District Court of
Dallas County, Texas. (Tr.Ct.No. 09-10076-
G).

Opinion delivered by Justice Myers, Justices
Moseley and Fillmore participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**. It is **ORDERED** that appellee Transcontinental Realty Investors, Inc. recover its costs of this appeal from appellant RTKL Associates, Inc.

Judgment entered December 10, 2012.

_____
LANA MYERS
JUSTICE